# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JOEL MERCADO, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 1:20-CV-07793 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| DELANTE GREER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In early January 2019, Delante Greer, a police officer for the Village of Gurnee, shot and injured the Plaintiffs' family dog, Glizzy, while attempting to serve a citation at the Plaintiffs' home in the Village of Round Lake. After the shooting, the Plaintiffs—Joel Mercado, Luz Amaya, and Amaya's minor children—filed this civil-rights action, 42 U.S.C § 1983, against Greer and David Cheney, a Village of Round Lake police officer who also was at the scene of the shooting. R. 1, Compl.[1] The Plaintiffs allege that the officers used excessive force and illegally seized their property (that is, the dog) in violation of the Fourth Amendment. *Id.* The Plaintiffs also sued the Village of Gurnee under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), for allegedly failing to train its officers and, separately, for state law indemnification.[2] *Id.* Other state law claims brought by the Plaintiffs were

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number. Under Civil Rule 5.2(a)(3), the Opinion refers to the two minor children by their initials, J.R. and H.R.

[2]The Court has subject matter jurisdiction under 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

dismissed earlier in the case. R. 34, Order on Mots. Dismiss. Now, Cheney—alone—
and Greer and the Village of Gurnee—together—move separately for summary judg-
ment against the remaining claims: illegal seizure, excessive force, *Monell*, and state
law indemnification. For the reasons explained in this Opinion, the motions for sum-
mary judgment are granted in part and denied in part.

## I. Background

### A. Local Rule 56.1

Before setting out the facts relevant to the motions, the Court must first ad-
dress a procedural argument raised by the Plaintiffs against Officer Cheney. The
Plaintiffs argue that Cheney's brief and accompanying statement of material facts
should be stricken for failure to comply with Local Rule 56.1. R. 75, Pls.' Resp. to
Cheney at 2–3.[3] More specifically, the Plaintiffs complain that (1) Cheney fails to pro-
vide pinpoint citations to the depositions that he refers to in the brief and statement
of facts in violation of Local Rule 56.1(a)(2); and (2) Cheney's brief fails to cite directly
to specific paragraphs in his statement of facts as required by Local Rule 56.1(g).

Local Rule 56.1 governs motions for summary judgment in this District. Its
purpose "is to have the litigants present to the district court a clear, concise list of
material facts that are central to the summary judgment determination." *Curtis v.
Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015). Complying with Local Rule
56.1 is not a technicality; the Court is not required to "wade through improper denials

---

[3]Because this Opinion considers the two separate motions for summary judgment, its
citation-labels refer to either the Cheney or Greer and Gurnee filings.

and legal argument in search of a genuinely disputed fact." *Id.* at 219 (cleaned up).[4] The Court has discretion over its handling of local-rule violations "to promote the clarity of summary judgment filings." *E.g.*, *Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011) (cleaned up).

Having said that, although the Plaintiffs are right that Cheney did not fully comply with the local rule, the violations are not so serious as to strike the filings or to require him to refile his summary-judgment briefing and statement of facts. Even with the mistakes and omissions, the Court was able to readily identify which facts are disputed and which are not, as well as to cross-reference the facts used in Cheney's briefing with his Local Rule 56.1 statement of facts. The Plaintiffs too were able to admit, dispute, or admit in part and dispute in part the facts advanced by Cheney. *See* R. 74, Pls.' Resp. to Cheney DSOF. The Plaintiffs do not argue that they were unable to adequately respond to Cheney's arguments. In short, the purpose of the rule—to ensure clarity and highlight the central facts material to summary-judgment resolution—is sufficiently satisfied, even if Cheney created an inconvenience. Imposing the penalty that the Plaintiffs demand, when the purpose of the rule has not been foiled, is unnecessary and would constitute a waste of judicial resources. In sum, there is no need for Cheney to refile his materials, though he should take more care in the future to understand and comply with the specific requirements of the local rules.

---

[4]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

### B. Facts

In deciding a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). For purposes of the motions in this case, the Court sets out and relies on those facts that are not genuinely undisputed, as well as the January 3 police body-camera footage introduced into the record and unchallenged by the parties.

The chain of events leading up to this lawsuit began a few weeks before January 3, when Yeison Amaya—an adult son of Luz Amaya who is not one of the Plaintiffs—got into a fight at Gurnee Mills Mall. R. 61, Greer and Gurnee DSOF ¶¶ 1–2; R. 61-2, Fight Video Footage. Greer investigated the fight and identified Yeison as a participant. Greer and Gurnee DSOF ¶ 2; R. 61-1, Greer Dep. Tr. at 64:17–65:1, 71:16–18, 73:1–25, 76:16–84:24. Greer then decided to speak with Yeison and, if Yeison cooperated, Greer planned to serve him with a municipal-ordinance citation, which only carries a civil fine. Greer and Gurnee DSOF ¶ 4; Greer Dep. Tr. at 82:15–85:9. Because Greer believed that Yeison lived in the Village of Round Lake—at his mother and stepfather's home—he received backup from Round Lake officers Cheney and Kurt Schultz (Schultz is not a named Defendant). Greer and Gurnee DSOF ¶ 5; Greer Dep. Tr. at 83:7–86:10, 95:10–96:1 (The parties contest whether Yeison is gang-affiliated. R. 71, Pls.' Resp. to Greer and Gurnee DSOF ¶ 2.).

4

On January 3, the three officers arrived at Yeison's supposed address in the Village of Round Lake. Pls.' Resp. to Cheney DSOF ¶ 1. The Plaintiffs deny that Yeison lived at this address. *Id.* Greer knocked on the front door, and J.R.—Luz Amaya's daughter and a minor—answered. Greer and Gurnee DSOF ¶ 6; Greer Dep. Tr. at 96:2–21, 99:17–25; R. 59-8, Greer Body-Camera Video at 0:00:30–0:01:02. At his deposition, Greer did not recall noticing the beware-of-dog sign displayed in a front window close to the door. Greer Dep. Tr. at 96:2–21. In any case, after J.R. opened the door, Greer let her know that he needed to talk to her brother Yeison to give him a piece of paper. Greer and Gurnee DSOF ¶ 6; Greer Body-Camera Video at 0:00:59–0:01:10. J.R. thought Yeison was not home, so Greer asked her to call him. Greer Body-Camera Video at 0:00:59–0:01:10. She did, and Yeison answered, explaining over speaker-phone—with Greer listening—that he was, in fact, home and would come to the door to talk. Greer and Gurnee DSOF ¶ 6; Greer Body-Camera Video at 0:01:10–0:02:05.

Suddenly, as Yeison and Greer talked, the family's pit-bull Glizzy ran up from inside the house, passed on the right of Yeison's legs, and went out the front door where Greer was standing. Greer Body-Camera Video at 0:02:05–0:02:53. (As the dog ran out, someone inside the house—presumably H.R., Luz Amaya's other son and a minor—exclaimed "hey!" R. 59-9, Cheney Body-Camera Video at 0:04:35–0:04:36).[5] Greer also exclaimed something in surprise, jumped back, tried to shut the screen-

---

[5]H.R. testified in his deposition that he was sleeping with Glizzy at the time that the officers arrived at the family's house, R. 61-6, H.R. Dep. Tr. at 21:2–20, and then he opened the door to his bedroom and that is when Glizzy ran out, *id.*

door on the dog, and then retreated into the front-yard area where Glizzy followed
him, bounding in Greer's direction for about a second before turning to his left, where
Cheney was standing, also in the yard. Greer Body-Camera Video at 0:02:53–0:02:55;
Cheney Body-Camera Video at 0:04:36–0:04:39. Cheney unholstered his gun as
Glizzy approached him. Greer Body-Camera Video at 0:02:53–0:02:57. The dog was
wagging his tail. *Id.* But Glizzy also barked a couple of times as he approached.
Cheney Body-Camera Video at 0:04:36–0:04:41. Glizzy hopped a couple of seconds
around Cheney, who pointed his gun down at the dog with his right hand while hold-
ing out his left arm. R. 59, Cheney DSOF ¶¶ 17–21; Greer Body-Camera Video at
0:02:53–0:02:57; Cheney Body-Camera Video at 0:04:36–0:04:42. Cheney did not fire.
*Id.* Glizzy, still barking, then turned back toward Greer, who had been observing with
his right hand by his gun. Greer Body-Camera Video at 0:02:56–0:02:58; Cheney
Body-Camera Video at 0:04:41–0:04:44. After the dog turned away from him, Cheney
holstered his firearm, and removed the cartridge from his taser. Cheney DSOF ¶ 23;
R. 59-7, Cheney Dep. Tr. at 50:1–61:6.

It did not take more than two seconds for Glizzy to re-approach Greer, who
unholstered his gun, pointed it downward, and shot Glizzy almost as soon as the dog
got close, all of which happened within two to four seconds from Glizzy leaving
Cheney's space. Greer Body-Camera Video at 0:02:57–0:03:01; Cheney Body-Camera
Video at 0:04:41–0:04:44. After being shot in the mouth, Glizzy retreated into the
house, whimpering on his way back. Greer Body-Camera Video at 0:03:01–0:03:04.
As the dog returned home, Cheney pointed his activated taser at him without firing.

Cheney DSOF ¶¶ 23, 25; Cheney Dep. Tr. at 50:1–61:6; Cheney Body-Camera Video at 0:04:44–0:04:46. From the moment Glizzy left the house, Cheney and Greer shouted repeatedly at Yeison and J.R., who were at the front-door threshold, to call or hold the dog back. Greer Body-Camera Video at 0:02:52–0:02:59; Cheney Body-Camera Video at 0:04:36–0:04:50.

The whole incident lasted no more than 15 seconds from when Glizzy left the house to retreating inside. Greer Body-Camera Video at 0:02:52–0:03:05; Cheney Body-Camera Video at 0:04:36–0:04:50. During that brief time, the body-camera foot-age shows Yeison standing at the threshold of the house holding the screen-door open with J.R. somewhat visible behind him. *Id.* H.R. is not visible inside the house. *Id.* After the shooting, both Yeison and J.R. left the front-door threshold and came out onto the stoop, with J.R. crying and Yeison repeatedly explaining that Glizzy does not bite. Greer Body-Camera Video at 0:02:59–0:03:21. Hearing that, Greer apologized, saying that he did not know that the dog did not bite. *Id.* In the end, Glizzy survived and no one else was physically hurt. R. 57, Cheney Mot. Summ. J. ¶ 5.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And again, in eval-uating summary judgment motions, courts must view the facts and draw reasonable

inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. Illegal Seizure

First, both motions request summary judgment on the Fourth Amendment illegal-seizure claims against Cheney and Greer. Given that, this Opinion first lays out the relevant circuit law for the illegal seizure of pets and then evaluates Cheney's and Greer's arguments for summary judgment separately.

It is clearly established law in the Seventh Circuit that an officer cannot kill a person's pet unnecessarily. *Viilo v. Eyre*, 547 F.3d 707, 711 (7th Cir. 2008) ("The *Siebert* decision is enough to give police officers reasonable notice that unnecessarily killing a person's pet offends the Fourth Amendment.") (cleaned up). What's more, the Fourth Amendment "provides a remedy when a citizen's property is unreasonably

8

damaged during a search." *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (cleaned up). "Domestic animals are effects within the meaning of the Fourth Amendment." *Viilo*, 547 F.3d at 711 (cleaned up). So it is also clearly illegal for an officer to unreasonably injure a pet. Indeed, "the use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable." *Id.* at 710.

### 1. Cheney

Cheney argues that he never illegally seized Glizzy because he only pointed his weapons at the dog and did not shoot him. R. 58, Cheney Br. at 3, 5, 7–8. It is undisputed that Cheney did not injure Glizzy. Still, the Plaintiffs respond—without much explanation—that Cheney's pointing of his taser constitutes an unreasonable seizure under the circumstances. Pls.' Resp. to Cheney at 4. But they do not identify any authority to support what would constitute a novel legal holding: that an officer's *pointing* of a weapon—a gun or a taser—specifically at a *pet* constitutes an illegal seizure of that pet under the Fourth Amendment. Simply put, the killing or injuring of a pet can constitute illegal seizure; not so the act of just *aiming* a weapon at one. *See Viilo*, 547 F.3d at 710 ("The *killing* of a companion dog constitutes a seizure within the meaning of the Fourth Amendment) (cleaned up) (emphasis added); *Taylor v. City of Chicago*, 2010 WL 4877797, at *2 (N.D. Ill. Nov. 23, 2010) (*non-fatal shooting* of a dog) (emphasis added).[6] Because it is undisputed that Cheney did not actually

---

[6]It is true that when a police officer aims a firearm at a *person*, the mere pointing of the gun can qualify as a seizure. *See Baird v. Renbarger*, 576 F.3d 340, 345 (7th Cir. 2009). But the Plaintiffs point to no case in which that holding has been extended to pets.

injure Glizzy, summary judgment is granted on the Plaintiffs' illegal-seizure claim against Cheney.

## 2. Greer

Greer and the Village of Gurnee argue that Greer's shooting of Glizzy was objectively reasonable, so he is entitled, at the very least, to qualified immunity. R. 62, Greer and Gurnee Br. at 5–7. Qualified immunity protects government officials from civil liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* To defeat qualified immunity, a plaintiff must establish that (1) "the official violated a statutory or constitutional right" and (2) "the right was clearly established at the time of the challenged conduct." *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018) (cleaned up). A right is "clearly established" if the conduct is so clearly prohibited that a "reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Court is free to decide which prong to address first; if either inquiry is answered in the negative, the defendant official is entitled to qualified immunity. *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017).

Greer and the Village concede that the prohibition against unreasonably killing or injuring a person's pet was clearly established at the time of Greer's shooting

of Glizzy. Greer and Gurnee Br. at 5. (The Defendants refrained from arguing that the shooting of Glizzy in these particular circumstances did not violate the Fourth Amendment.). So the Court will only consider the first element of the qualified immunity test at summary judgment: whether a jury could find that Greer's shooting of Plaintiffs' pet dog was unreasonable, thus violating Plaintiffs' Fourth Amendment rights. If so, summary judgment must be denied. To that end, the Court evaluates the evidentiary record, including the police body-camera videos, in the light most favorable to non-movant Plaintiffs.

Giving reasonable inferences to the Plaintiffs, a jury could reasonably find that Glizzy did *not* approach Greer with aggressive intent. Remember that the use of deadly force against a pet is reasonable only when the animal poses an immediate danger making the use of force unavoidable. *Viilo*, 547 F.3d at 710. The body-camera videos show Glizzy wagging his tail before being shot; the dog also did not bare his teeth or growl at Greer (though the dog did leap about and bark). Greer Body-Camera Video at 0:02:52–0:03:05; Cheney Body-Camera Video at 0:04:36–0:04:50. At no point during the time that Glizzy was outside of the house did the dog nip or attempt to bite Cheney or Greer. *Id.* Instead, the videos show *Greer* becoming agitated very quickly. When he saw the dog, he exclaimed in surprise and jumped back, attempting to shut the screen door on Glizzy. Greer Body-Camera Video at 0:02:53–0:02:55; Cheney Body-Camera Video at 0:04:36–0:04:39. Then, when the dog approached him a second time, Greer shot him almost immediately, within two seconds of Glizzy

turning back to him. Greer Body-Camera Video at 0:02:57–0:03:01; Cheney Body-Camera Video at 0:04:41–0:04:44.

That Greer shot the dog so quickly, especially after observing Glizzy bouncing around Cheney without attacking, suggests that Greer overreacted and pulled the trigger impulsively, in the absence of an imminent danger and without the benefit of seeing what the dog meant to do upon reaching him. It is also relevant that Cheney, who found himself in nearly identical circumstances, did not shoot Glizzy.[7] What's more, when Glizzy was occupied with Cheney, Greer had some seconds to recover from his initial surprise and yet still decided to use his gun instead of reaching for his less lethal taser. Greer Body-Camera Video at 0:02:52–0:03:05; Cheney Body-Camera Video at 0:04:36–0:04:50. Of course, Greer is right that an officer does not need to wait to be attacked to defend himself, and police officers do have to make split-second judgments in tense circumstances. Greer and Gurnee Br. at 5–6 (citing *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)). But the record, including the body-camera videos, allows a jury to reasonably find that the shooting was an unreasonable over-reaction.

Relatedly, it is undisputed that Greer had not, at the time of the shooting, received training on how to deal with dogs from the Village of Gurnee. R. 77, Defs. Greer and Gurnee Resp. to PSOAF ¶ 34. That fact is favorable to the Plaintiffs because it

---

[7]Greer argues that he was not in the same position as Cheney because Glizzy "stopped pursuing Defendant Cheney." R. 78, Greer and Gurnee Reply at 4–5. But it is not clear what Greer means since Cheney did, like Greer, have the dog in his personal space for several seconds, but—unlike Greer—did not shoot the dog. Greer Body-Camera Video at 0:02:53–0:02:57; Cheney Body-Camera Video at 0:04:36–0:04:41.

suggests that Greer was unprepared to deal with the situation he faced. And there is some record evidence—though it is shaky and only marginally persuasive—that Greer might be sensitive to dogs because of a bite or nip he suffered from his own dog in 2004 or 2005. Greer Dep. Tr. at 187:11–188:21. In all, it would be reasonable for a jury to conclude that Greer panicked and acted unreasonably. No doubt that there are other facts favorable to Greer—like Glizzy's barking and the beware-of-dog sign on the front window, among others—but those are not enough to grant summary judgment given that the Plaintiffs get the benefit of reasonable inferences. There is a genuine issue of material fact on whether Glizzy posed an immediate danger. *See Viilo*, 547 F.3d at 710. So summary judgment is denied as to the illegal-seizure claim against Greer. The corresponding state law indemnification claim also survives, but only as applicable to Greer for the possible illegal seizure of Plaintiffs' pet.

## B. Excessive Force

Next up are the Plaintiffs' claims that Cheney and Greer unreasonably seized H.R. and J.R. and used excessive force on them. Each officer's arguments are evaluated in turn. But first it is necessary to set out the legal standards applicable to constitutional claims like these brought under the Fourth Amendment's unreasonable-seizure clause. First, whether the force used in a seizure complies with the Fourth Amendment depends on whether the actions of the officer were objectively reasonable. *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The officers' actions are judged "in light of the facts and circumstances confronting them, without regard to their underlying intent or

13

motivation." *Graham*, 490 U.S. at 397 (cleaned up). That assessment is made from the "perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Burton v. City of Zion*, 901 F.3d 772, 777 (7th Cir. 2018) (cleaned up). Finally, the Plaintiffs do not need to show physical injury to sustain an excessive force claim; rather, an "arrest can be effectuated by the slightest application of physical force, or by some other show of authority." *Baird*, 576 F.3d at 344.

### 1. Cheney

Starting with Officer Cheney, he argues that there is no evidence that he ever pointed any weapon, whether his gun or his taser, at H.R. or J.R. More specifically, he contends that there is no evidence that H.R. and J.R. were outside the house around the time when Glizzy was shot and that he only ever pointed any weapon at Glizzy, and only in reaction to the dog. Cheney Br. ¶¶ 11–19. Thus, he argues, there is no evidence that he ever seized H.R. or J.R., *Id.* ¶¶ 14–15, and he further argues that his actions were objectively reasonable and protected by qualified immunity. *Id.* ¶¶ 20–24. The Plaintiffs respond that a disputed, material question of fact exists as to whether Cheney pointed his gun and taser, with its red-light aim, in the direction of the children. Pls.' Resp. to Cheney at 4–5. The Plaintiffs argue, relatedly, that Cheney did seize H.R. and J.R. *Id.* at 6.

It is true that an officer can be liable for excessive force by pointing a gun at a compliant, nonviolent person. *See Baird*, 576 F.3d at 345 (reaffirming that "gun pointing when an individual presents no danger is unreasonable and violates the Fourth

Amendment"). But a claim of excessive force arising out of the Fourth Amendment's unreasonable seizure clause naturally requires that a person be "seized." *Id.* at 344. That is, it would require for H.R. and J.R. to have been detained. "A person is seized only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Griffin*, 652 F.3d 793, 798 (7th Cir. 2011) (cleaned up). The Plaintiffs argue that H.R. and J.R. were seized when Cheney ordered them to call back Glizzy after the dog left the house because that constituted a "show of authority" that the children obeyed. Pls.' Resp. to Cheney at 4–5. But a mere request to call back a dog is not a seizure under the Fourth Amendment. And the Plaintiffs provide no authority to the contrary. Rather, the relevant inquiry is whether H.R.'s or J.R.'s freedom of movement was restricted. For instance, the cases that the Plaintiffs cite involve situations in which officers pointed guns at *individuals* or those surrounding them, or ordered them to be still, or get on the ground, and which caused those individuals to be restricted in their movement. *See Baird*, 576 F.3d at 345 (officer "decided to wield a 9–millimeter submachine gun, which he used to detain various people at the search site"); *Corbitt v. Vickers*, 929 F.3d 1304, 1313 (11th Cir. 2019) (police officer ordered the "children to the ground and held them there at gunpoint"); *Tate v. City of Chicago*, 2020 WL 6715660, at *3 (N.D. Ill. Nov. 16, 2020) (officers order a family, including a baby, to remain seated in the living room for the duration of the search).

The Plaintiffs do not provide evidence that shows that H.R. or J.R. were restrained. Indeed, the videos show J.R. scooting into the threshold of the house when

Glizzy first escapes and then freely walking back into the front-stoop area, crying after Glizzy had been shot and returned home. Greer Body-Camera Video at 0:02:52–0:03:21; Cheney Body-Camera Video at 0:04:36–0:05:10. The videos do not show H.R., who remained inside the house throughout the incident—even if he might have been close to the front door. R. 72, PSOAF ¶ 33 (H.R. saw Glizzy run out the door and then only *heard* the shot) (emphasis added). In fact, the videos show that H.R. remained in the house when Yeison closed the door after Glizzy's shooting, while he (Yeison) and J.R. remained outside with the officers. Greer Body-Camera Video at 0:02:52–0:03:21; Cheney Body-Camera Video at 0:04:36–0:05:10. Because the children were never seized by Cheney, their excessive-force claims against him do not survive summary judgment.

Alternatively, qualified immunity is also dispositive. That is because there is no clearly established right that Cheney violated when he pulled his gun and taser and pointed those weapons, at different times, in the direction of Glizzy, even if—assuming for the purposes of argument—that direction was also the general direction where H.R. and J.R. were present. *See* Cheney Br. ¶ 22. The Plaintiffs bear the burden of demonstrating that a right was clearly established at the time the alleged violation occurred. *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017). This demonstration "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (cleaned up). To show that the law was clearly established, a plaintiff can point to a "closely analogous case" finding the alleged violation unlawful. *Reed v. Palmer*, 906 F.3d 540, 546 (7th

16

Cir. 2018). Again, it is clearly established that an officer can be guilty of excessive force by pointing a gun at a compliant, nonviolent person. *Baird*, 576 F.3d at 345. But the Plaintiffs do not identify any controlling Supreme Court or Seventh Circuit case that is closely analogous to the situation here, in which—and these facts are undisputed—an officer pointed his weapons at a pet, never fired, and did not harm the pet or anyone else, but his line of fire might have strayed in the *general* direction of a group of people.

In any event, the evidence refutes the contention that Cheney's weapons were ever pointed at the children. First, Cheney could not have pointed his weapons at H.R. because H.R. remained inside the house. PSOAF ¶ 33; Greer Body-Camera Video at 0:02:52–0:03:21; Cheney Body-Camera Video at 0:04:36–0:05:10. As to J.R., the videos clearly show Cheney pointing his gun downward at Glizzy and never up at the house or at J.R., who in any case was inside the threshold of the house. Greer Body-Camera Video at 0:02:52–0:03:05; Cheney Body-Camera Video at 0:04:36–0:04:50. Cheney did point his taser at Glizzy as the dog returned home after being shot, and Cheney's line of fire did start to stray into the area of the front-door where Yeison was leaning out holding the screen door while calling to Glizzy. *Id.* But there is no video evidence of Cheney's taser-line-of-fire crossing J.R. specifically. *Id.* In fact, J.R. testified at her deposition that Greer did not point his gun at her, though she did fear that he was going to fire a bullet that would ricochet and hit her. R. 61-5, J.R. Dep. Tr. at 61:13-63:18. So, in these circumstances, the Plaintiffs have failed to show

17

that whatever Cheney did violated a clearly established right. The result is that the Plaintiffs do not overcome Cheney's qualified immunity.

Summary judgment is granted on the Plaintiffs' excessive-force claim against Cheney. Having granted summary judgment on the illegal-seizure and excessive-force claims against Cheney, the Court also grants summary judgment on the state law indemnification claim as to Cheney.

### 2. Greer

Like Cheney, Greer also argues that there is no evidence that he pointed his gun at H.R. or J.R., and that he too is entitled to qualified immunity on the excessive-force claim against him. Greer and Gurnee Br. at 5–7. The Plaintiffs respond that a disputed, material question of fact exists as to whether Greer pointed his gun at the children and that qualified immunity does not protect him. R. 73, Pls.' Resp. to Greer and Gurnee at 4–7. But the Plaintiffs misunderstand the record.

Here again, there is no evidence that Greer ever seized J.R. or H.R., or that he ever pointed his gun at them. H.R. remained inside the house and only heard the gunshot that hit Glizzy; so, at no point could Greer's gun been pointed at him. PSOAF ¶ 33; Greer Body-Camera Video at 0:02:52–0:03:21; Cheney Body-Camera Video at 0:04:36–0:05:10. There is also nothing to suggest that he was not free to move about. As to J.R., there is her testimony that Greer did not point his gun at her, and that instead she was scared that the bullet would ricochet and hit her. J.R. Dep. Tr. at 61:13–63:18. Indeed, the Plaintiffs are careful to point only to those pieces of J.R.'s testimony in which she communicates a fear that a bullet might strike her, Pls.' Resp.

to Greer and Gurnee at 4, glossing over the part where she admits that Greer's gun was *not* pointed at her. J.R. Dep. Tr. at 63:16–63:18 ("Q. Okay. But my question was[,] the gun was not pointed at you[,] correct? A. No, it was not."). Greer's bodycam footage corroborates her testimony. It shows him pointing his gun downward at the dog and not upward toward the house and J.R. Greer Body-Camera Video at 0:02:52–0:03:05; Cheney Body-Camera Video at 0:04:36–0:04:50. Also, and as already explained, J.R. was at liberty to scoot back into the house during the incident, and free to leave the house and return to the front-porch area after Glizzy's shooting. Greer Body-Camera Video at 0:02:52–0:03:21; Cheney Body-Camera Video at 0:04:36–0:05:10.

In short, with no record evidence that the children were restrained by Greer or that Greer pointed his gun at them, they could not have been seized, and there is no way to overcome qualified immunity on this record. So summary judgment is granted on the excessive-force claim as to Greer.

### C. Monell

Lastly, the Village of Gurnee seeks summary judgment on the Plaintiffs' municipal-liability claim under *Monell*. To prevail on this claim, the Plaintiffs must show that the injury was caused by (1) an express policy; or (2) a common practice so widespread and well-settled as to constitute a custom or usage with the force of law; or (3) that a person with final policy-making authority caused the constitutional injury. *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021) (citing *Monell*, 436 U.S. at 694). The Village argues that none of the three *Monell* municipal-liability scenarios apply here. Greer and Gurnee Br. at 8. In

19

response, the Plaintiffs contend that the Village's failure to train its officers to deal with domestic animals constitutes an express policy that caused a constitutional deprivation, the unreasonable seizure of their property: Glizzy. Pls.' Resp. to Greer and Gurnee at 12.

"Establishing *Monell* liability based on evidence of inadequate training or supervision requires proof of 'deliberate indifference' on the part of the local government." *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029 (7th Cir. 2006) (cleaned up). This, in turn, requires proof of a "(1) failure to provide adequate training in light of foreseeable consequences; or (2) failure to act in response to repeated complaints of constitutional violations by [Village of Gurnee] officers." *Id.* at 1029–30. The Plaintiffs point to *Saathoff v. City of Champaign* as analogous to this case. There, a district court held that *Monell* liability had been sufficiently pled because the plaintiffs alleged that despite frequent contact with domestic animals and a previous instance in which the defendant improperly discharged his firearm, still the city of Champaign had not offered domestic-animal training. Pls.' Resp. to Greer and Gurnee at 13 (citing 2014 WL 2935974, at *2 (C.D. Ill. June 30, 2014)). Despite *Saathoff* being non-binding and a motion-to-dismiss opinion, it nevertheless highlights a gap in the Plaintiffs' argument.

In particular, the Plaintiffs have not developed any evidence that Village of Gurnee officers had frequent contact with domestic animals before Glizzy's shooting, nor that there had been repeated constitutional violations relating to the shooting of pets, nor any evidence that Greer specifically had ever previously injured or killed a

domestic animal. Pls.' Resp. to Greer and Gurnee at 12–13. The Plaintiffs only point to a *later* incident in which Greer shot another dog. *Id.* at 13. But otherwise there is no record evidence of deliberate indifference by the Village of Gurnee in the face of foreseeable consequences or a failure to act based on prior constitutional violations by officers or by Greer specifically *before* Glizzy's shooting. With no evidence of deliberate indifference by the Village, the Court grants summary judgment against the *Monell* claim.

### IV. Conclusion

The Defendants' motions for summary judgment are granted in part and denied in part. To summarize, summary judgment is granted on the illegal-seizure claim against Cheney; the excessive-force claims against both officers; the state law indemnification claims as to Cheney and as to Greer's alleged use of excessive force; and the *Monell* claim against the Village of Gurnee. The illegal-seizure claim against Greer survives, specifically as to the seizure of the dog, as does the corresponding state law indemnification claim.

The parties shall begin settlement negotiations and file a status report on April 21, 2023. The tracking status hearing of April 14, 2023, is reset to April 28, 2023, at 8:30 a.m., but to track the case only (no appearance is required).

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 31, 2023

21